All right, Mr. Dickey. Good morning. Thank you, Mr. Chief Judge, and may it please the court. My name is Gary Dickey, and I represent William Trimble, who asked this court to reverse the revocation of his supervised release and remand this matter for resentencing. As a well as subsequent extensions, the district court required Mr. Trimble to participate in polygraph examinations. Implicitly recognizing the tension between the court-ordered polygraph examination and Mr. Trimble's Fifth Amendment right against self-incrimination, the district court provided Mr. Trimble with essentially a grant of immunity for statements that he made during any examination. Specifically, the provision of the terms and conditions of the supervised release provided that the results of a polygraph examination will not be used for the purpose of revocation of Mr. Trimble's supervised release. Mr. Dickey, in this case, as I read the record, Mr. Trimble acts potentially warranting revocation without resort to the results of the polygraph based on the defendant's own statements outside of the polygraph context. Is that incorrect? Your Honor, I think that is, we would disagree on that characterization of the record. Explain to me then why when he tells his probation officer outside of the context of the polygraph that he hasn't disclosed information that can be brought forth to the court for consideration of revocation. Sure, I'll answer that in two parts. The first is, I think what the record shows is that with respect to that specific violation, which is the contact with the minor, in the July polygraph examination, during the post-interview phase, he admitted to having contact with the minor and then followed up the examination with a call to the probation officer in which he admitted that he had feelings for the minor. So the actual admission of the contact came during the post-interview phase and he was providing additional context during the subsequent interview. Now, to the second point, which is really the heart of this appeal, this court has to decide the scope of the immunity provision that was provided in the supervised release conditions. So if this were a case of statutory interpretation, for example, we would look at the text and the purpose of that provision is co-extensive, essentially with a CASTIGAR immunity provision. And there's two reasons for that. First, the specific language says the results of the polygraph examination should not be used. Well, how far does that phrase go when you say results? Because at some level, you can look at the results as simply being the estimation of the operator of the device, whether or not he has an opinion about his truth-telling. Or it could be maybe the actual physiological data that's recorded. But does that limit the use of actual statements that are made as opposed to simply what the results of the test itself might be? So the district court interpreted the provision as not providing admissibility of what Judge Rose called LEADS evidence, which is evidence that would not have been obtained but for the statements. We think that LEADS evidence should be excluded under a CASTIGAR type analysis. And so textually, when the provision says results, results, as we point out in the Barrage case, essentially requires a but-for nexus. And if the court provides a but-for nexus, or rules a but-for nexus applies, but for Mr. Tremble's statements during the examination, there would not have been any need to follow up with the probation officer. And the probation officer would not have had any reason to follow up with a minor child's grandmother to corroborate his admissions. So if the court applies a but-for nexus, then we assert that the district court clearly erred. And we would assert that the district court should undertake a CASTIGAR type analysis on remand. And if the court does that, at least on this current record, the government has not established a truly independent basis for corroborating the statements that Mr. Tremble made during his examination. So we would submit not only a textual basis supports that, but if the court looks behind the immunity provision and looks to the purpose of it, we would submit that that also supports our interpretation, because the only logical reason why a court would put that immunity provision in is exactly the same type of situation in CASTIGAR, where you have... So what specific information do you state that the district court used from the polygraph examination to revoke? So with respect to the contact with a minor, the district court cited the evidence that the probation officer on July 31st, the day after the July examination, contacted the minor's grandmother and corroborated that Mr. Tremble had contact with her. But for his contact with the probation officer was of his own. No one forced him to do that. Well, I mean, I would disagree with that. When the terms and conditions of his supervision say that he must participate in a polygraph examination, if he doesn't do that, then he's going to be revoked. The district court said that. The district court said if he refused to do that, he would have been placed in jail. So the initial basis for the conversation with the probation officer following the July 30th examination was from the examination itself. And so if the court were to undertake a CASTIGAR type analysis, that is not a truly independent basis for evidence to present in Mr. Tremble's supervised release revocation hearing. So again, getting back to the purpose of the immunity provision, what you have is a term or condition that provides that Mr. Tremble is able to assert his Fifth Amendment right against self-incrimination. Again, Judge Rose said, had he attempted to do that, she would have placed him in jail until they answered questions, which she indicated she had done for other individuals. And so did she say, Mr. Dickey, specifically, that he had no right to invoke his Fifth Amendment privilege? That would seem contrary to the different context about going to jail. So if you look at the transcript, she did not specifically reference the Fifth Amendment. During my argument, I pointed out to the court, had he shown up and said, I'm not answering any questions, he would have been held in contempt. And during the court's analysis, she confirmed my interpretation. And she said, Mr. Dickey's right. If Mr. Tremble showed up and refused to answer questions as part of the examination, he would be put in jail and he'd sit there until he answers them, which she has done in other cases. So while not specifically mentioning the Fifth Amendment, I don't know. If you had come in to her and said, you can't put my guy in jail for declining on the Fifth Amendment grounds because of Minnesota versus Murphy, she may have come to a conclusion. I agree with you, Judge Calton. I think you're right. I think he did have the right to assert the Fifth Amendment, which supports our interpretation of the scope of the immunity. I mean, the only reasonable inference you can draw as to why you would put the immunity provision in is to avoid a situation where you're violating Minnesota versus New Jersey. And so if that is true, if the immunity is intended to avoid a Fifth Amendment violation, then that walks us right in essentially what Castigar said, which is an immunity provision should be interpreted to be coextensive with the Fifth Amendment. Except that he didn't invoke his Fifth Amendment right. He answered the questions. So that's a waiver of his Fifth Amendment right. Well, but so I think that's unfair to put that on Mr. Trimble. Here's why. I thought that's what happened in Murphy. That's why I was going down that line. But go ahead. Tell me. Well, here's where it's different. I mean, Mr. Trimble was told he has to answer the questions or he's going to go to jail for contempt. But he's also told he has immunity, which means he essentially doesn't have a right to self-incrimination because he can't incriminate himself because he has a form of immunity. And that's the rub. And so the only way to logically interpret this provision in a way that's consistent with his Fifth Amendment rights, in a way that's consistent with the text, is to view it as an immunity provision that was intended to be coextensive with his Fifth Amendment right. And then and then that gets us to the Castigar type analysis. That's what we asked the court to do. And I would reserve the balance of my time for a while. Counsel, before you do that, I did want to know, are you still seeking reversal on the second, excuse me, the third violation regarding the cell phone? So, no, I think in that situation there is independent evidence that would be sufficient to support that. However, we are asking for re-sentencing if the second condition is reversed. All right. Thank you. Why would that affect the sentence? If there was an independent ground for revocation, why does the second ground matter? Well, so when the court imposes a sentence for the supervised release violation, the court undertakes the 3553 analysis. And so the nature and circumstances of the offense are entirely different. Additionally, I think it's important to note, Mr. Trimble advised his probation officer in May of 2020 about purchasing and possessing the phone for his roommate. And he was not violated at that time. This was only added as part of a group of violations subsequently in August. I think there's a reasonable inference that if it was only the possession or financing of the cell phone for the roommate, he may not have been revoked. And certainly it would be fair to infer that the sentence would be different. Thank you, Mr. Dickey. Mr. Gommer. Please, the court. Thank you, Your Honor. Mr. Dickey. My name is Craig Gommer. I'm an assistant United States attorney. I represent the United States in this case. The district court below revoked Mr. Trimble's supervised release based essentially on two things. The district court revoked Mr. Trimble's supervised release based first as far as violation number two was concerned, and that's contact with minors excuse me, violation number three, the unauthorized possession of the cell phone, and that came from a phone call by Mr. Trimble, and violation number two, most of the evidence from that, contact with minors, also came from unsolicited phone calls from Mr. Trimble. So the foundational evidence for both of these violations are substantially similar to the extent that both came from unsolicited phone calls to the probation officer by Mr. Trimble. One of those phone calls came after a polygraph exam, but that's a distinction without a difference. Mr. Trimble on both occasions picked up the phone, called his probation officer, and told her that he had violated the conditions of his supervised release. I don't think there's any basis in the law to revoke, to suppress that particular evidence. There's ample authority from this court. I've cited in my brief as a case United States versus Hatton from 1995, I believe, that says a voluntary, and there's no question those were voluntary phone calls, spontaneous disclosure to law enforcement that he initiates is not the product of an interrogation under the Fifth Amendment. It does not trigger the Fifth Amendment if the defendant makes a voluntary disclosure, if he initiates a discussion, a voluntary disclosure to law enforcement, or in this case his probation officer. And there's no question. Counselor, what exactly did he disclose to his probation officer when he called the probation officer? What did he say to him? Which time are you referring to, your honor? In relation to violation two, his contact, I'm assuming, which occurred after the polygraph. Very well. That's set forth in the trial transcript or in the hearing transcript on pages 22 through 26. He made an unsolicited phone call to his probation officer after he left the polygraphed exam. He reported that he had had unauthorized contact with an 11-year-old girl her name's Tatiana. She lived, or her mother, her grandmother, lived at the extended stay home hotel where Mr. Trimble was living. Her grandmother's name was Tina. She worked at the hotel. He disclosed that he was sexually attracted to her, that he had spoken with her. As a result of those disclosures, those voluntary disclosures that were made to the probation officer, she also testified that she picked up the phone and did some investigation and talked to the grandmother and confirmed that the contacts that Mr. Trimble had admitted to in May of 2020 had in fact occurred. So what we have is him making the statements, the probation officer picking up the phone, and independently corroborating them. Was the probation officer aware of the polygraph? The record is not really clear on that, though I would suspect that she was, Your Honor, absolutely. The main issue that the defense is arguing here, I think the linchpin of their argument, is focusing on what is in the conditions of Mr. Trimble's supervised release, where the district court ordered that the results that, yes, Mr. Trimble had to attend sex offender treatment, that included polygraph, that's a standard condition, certainly in our district, and I think throughout the nation, and that the results of the polygraph would not be used against him. That was not an immunity provision. That was basically a provision explaining what evidence could and could not be used as a matter of revocation. So in this particular case, the results of a polygraph exam are simple. The results are whether the defendant's answers to specific questions, when he's hooked up to the polygraph machine, are according to the machine and according to the analysis by the polygrapher either deceptive, not deceptive, or inconclusive. And at no point in these proceedings did we attempt to revoke Mr. Trimble based on the results of the polygraph exam. Mr. Gomer? Yes, this is Judge Smith. Are there, is there any case law limiting the results or the the concept of results of polygraph to the things you simply, you just described as the evaluation of the polygrapher's data? I'm not familiar with any off the top of my head, Your Honor. There was certainly trial or hearing testimony from Ms. Meyer who would talk to the polygrapher, and she explained on this record that those are in fact what is met in the profession by the results of the polygraph examination. And I would point, and it's cited in my brief, the Eighth Circuit has a case from a United States. It was a murder case, and the prosecution asked for admission into evidence about the defendant's physical reactions when he was asked certain questions during the polygraph. Not, not whether they were truthful, untruthful, inconclusive, but what the polygrapher, what the people there saw the defendant when he was asked questions there. And this court held that the responses to questions asked during the polygraph are inadmissible. So I think under the law of this circuit, if the responses, if you can offer into evidence, and it shouldn't be suppressed, the physical movements, the facial expressions of somebody, certainly what they said is admissible as well under the law of the circuit. And Rothgreave, I think, flat-out says that the responses to questions are admissible, that were asked during the exam are admissible as well. So we would rely on the Rothgreave case. Which case is that again? Rothgreave, R-O-T-H-G-E-B-789-F-2nd-647. The 1986 case from the circuit. But that case didn't involve an agreement about whether to use results, did it? That was just a case about whether polygraph evidence in general is admissible. That's a totally different question from whether an agreement has a certain meaning. I'm not sure I understand your question, Your Honor, when you say an agreement. What agreement are you referring to? Well, an agreement, I am... Agreement or an order here, I guess, is the better term, that the results will not be used. There was no such stipulation in Rothgreave. Well, it's not a stipulation here either, Your Honor. It's an order. There was no order being interpreted in Rothgreave. It was just a case about whether polygraph evidence is admissible, but the order here could exclude more than what the law excludes. I don't believe it does, Your Honor. All the order says is the results of the polygraph exam will not be the basis for a reputation. Yeah. They were not. What does results mean? But I'm just saying, I don't think Rothgreave interpreted that the term results in a supervised release order or anything like it, did it? What it does say is that the responses to questions asked during the polygraph are admissible and I'm sure, again, I'm not sure... But isn't admissibility just a whole different concept than an order that says that they will suppress the results? Aren't we still left trying to figure out, well, how broad is the term results? And isn't that where the focus of your argument needs to be placed? Well, again, Your Honor, if you go back and look at the record, there was testimony from Ms. Meyer based on what her expertise or her knowledge is, after talking to the polygrapher, in the profession, as a scientific matter, the results of the polygraph examination are that what the defendant said was either deceptive, not deceptive, or inconclusive. That's the record in this particular case. Even Judge Rose didn't agree with your position on that. She said she would exclude more than just the polygrapher's interpretation. I thought she said she would exclude the supervisee's answers in the exam. So she must have... She thought it was broader than what you're saying. No, Your Honor, that is not accurate. What Judge did in this particular case, if you go back and read the transcript, what she was doing is she was ruling as a matter of fairness, kind of an equitable solution. She thought that for a person such as Mr. Trimble, who is not, in fact, a lawyer, that there might have been some confusion on his part as to what the term results meant, so she erred on the side of caution by excluding that evidence. But I don't think anywhere in the record did she make a conclusion or a finding of fact that results meant anything, certainly as broad as the defense's argument in this particular case. She didn't say it was as broad as the defense's arguing, but she excluded more than what you're saying results means. She was in between. Go ahead. I'm sorry, Judge Erickson. My question was, and maybe I'm wrong, but I seem to recall from the transcript that she said, well, my understanding is what the government's understanding is, and I'm going to then exclude, and she went on to talk about not considering the answers given, right? Isn't that what was said? I just don't, you know, I'm not intimately familiar with the transcript. I read it, but... Basically, what the district court was doing, what Judge Rose did at the beginning of the hearing, I think it's around pages 12 and 13, she acknowledged to us that this case involved a suppression motion that had been filed by Mr. Trimble, and she said that she was basically, she kind of previewed and said that regardless of what she eventually ruled, this is the beginning of the case, that she thought violations two and three were both independent of the results of the examination, and so she was inclined to focus on those issues. We presented evidence on the entirety of the other violations, and the evidence on the other violations in substantial amount came from things that Mr. Trimble said during the course of his polygraph examination during the pre- or post-test. It wasn't the results, and at the end of the day, Judge exercised her discretion and tried to, she did revoke him only on the two violations that were not related to the results of the polygraph examination, that they were both related to independent phone calls, unsolicited phone calls that Mr. Trimble made to his probation officer where he admitted first that he had unauthorized contact with the minor, which was corroborated by her grandmother, and second that he had an unauthorized possession of the cell phone, which was corroborated by a police report. And so I believe based on this record, we do not have any Fifth Amendment violation, and as Judge Kaltzman, I think, noted earlier, it seems to me that controlling cases Minnesota versus Murphy. And what that case essentially holds, and that's in the context of a probation situation, but that the answers are not compelled within the meaning of the Fifth Amendment unless they are made over a valid claim of privilege. And in this particular case, Mr. Trimble didn't make a claim of privilege. His attorney didn't make the claim of privilege. He answered questions. But again, we're not even dealing with the answers to the questions provided during the polygraph pre and post test, because Judge said she wasn't going to use those. She excluded those. But Murphy also says that a meeting with the probation officer is not custodial within the meaning of the Fifth Amendment. It's just the fact that you have to show up and meet with the probation officer is not custodial. That's essentially what happened here. He was required to go and participate in the polygraph exam. But nothing required him. He wasn't compelled to call his probation officer. So that certainly we don't have a custodial situation here. Murphy's clear you cannot revoke probation based on an invocation of the Fifth Amendment. If Mr. Trimble had invoked his Fifth Amendment right, we would not be here, because he certainly had every right to say that he could refuse to answer questions on the grounds that it might incriminate him. And as a result in Murphy, the court concluded because he wasn't compelled to incriminate himself, the information that he volunteered was admissible. I think the same thing holds true here. Mr. Trimble was not compelled to incriminate himself. He picked up the phone on both occasions, called his probation officer. Now, what his impetus was for doing that, I think, is irrelevant. It doesn't matter whether he felt guilty. It doesn't matter whether it was based on information he disclosed during the pre-test or the post-test. That's really irrelevant. What matters is that he voluntarily picked up the phone, made a voluntary phone call on two occasions to his probation officer. They were not solicited. She didn't know he was going to be calling her. And on both occasions, he admitted to engaging in conduct that violated the terms and conditions of his supervised release. That had nothing to do with the polygraph results as set forth in the record of this case. The probation officer then took that information and corroborated it in the one instance by talking to the young lady's grandmother, and the other instance, as far as the cell phone is concerned, by requiring the police report that confirmed that Mr. Trimble had in fact reported his cell phone stolen. So I believe, yes. Your time's expired. I don't know if you probably, I don't know if you have the clock in front of you or not, but I just wanted to advise you. I do not, Your Honor. Thank you very much. I'll rest on just the conclusion that we believe the decision rendered by Judge Rose was correct and should be affirmed. All right. Thank you. Mr. Dickey, you're rebuttal. Thank you, Mr. Chief Judge. I want to start by directing the court to take a look at the transcript pages 34 through 40. That sets out the specific order and actions between Mr. Trimble's admissions and the probation officer's follow-up. In the July examination, Mr. Trimble admitted that there was a minor that walked into the extended stay hotel lobby in pajamas. That was during the examination. He followed up with a call to the probation officer immediately after to admit that he had had feelings about that minor. Then the next month, in August, during the examination, and this is undisputed, he disclosed that further, that he gave the minor and the grandmother a ride in his vehicle. Based on that information, the probation officer then followed up, subsequently made contact with the grandmother and verified. We submit that record indicates that, but for his admissions in the examination, there would not be evidence that would have been admitted at the revocation hearing to support the violation number two. And let me give you a hypothetical that demonstrates the danger. So suppose this provision continues in supervised release conditions, you know, future supervised offenders will undergo polygraph examinations. A sly probation officer will simply immediately follow up and say, how did the examination go? What did she ask and what were your answers? And, you know, I think that violates certainly the text in the spirit and purpose of the immunity provision, which says that the results can't be used against them. So, you know, the immunity provision is rendered meaningless if the government's positions allowed to prevail. And Judge Calton, you're correct, the district court, you know, did recognize it was an immunity provision, at least with respect to three of the five violations, and said that the evidence was not admissible and the violations were not founded. I wondered about that. I wonder if I was correct. It's a little unclear because at one point the judge says that she thinks the language, how she interprets the provision is that the finding of the polygrapher, deceptive or truthful or inconclusive, cannot be used, but anything the person says in connection with it can be used. But then she talks about using this as a teaching moment and how there may be a lack of clarity. And she says she's not going to find a violation on number four, five, and six. So, I don't know, did she really say that results is broader than the polygrapher's conclusion or was she just, I don't know, was she doing something else? Mr. Chief Judge, my time has expired. May I answer that question? Yes, you may. You may respond to the question. So I think you're correct, Judge Calton. She does make those comments. I think ultimately her conclusion, and she refers to this, I think, a couple of times as Leeds evidence. So her ultimate ruling was admissions that he made during the examination, pre-phase, post-interview, post-testing interview would be excluded. And that's why the three of the five were excluded. But what she called as Leeds evidence, which would be the subsequent investigation based on the admissions, would not be excluded. And so that's the rub, that that's not consistent with Castigar. And she didn't think Castigar applied, but I understand. Thank you. Very well. Thank you. I see no other questions. Thank you very much, Mr. Dickey. Court notes that you have represented Mr. Trimble today here under the Criminal Justice Act, and the court expresses its appreciation for your willingness to do so. My pleasure. All right. Madam clerk, would you call.